UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CATHERINE ANN SESSOR,

      Plaintiff,                         Civil Action No. 11-11621

v.

                                    HON. STEVEN WHALEN

COMMISSIONER OF SOCIAL       U.S. Magistrate Judge
SECURITY,

      Defendant.

_____/

## OPINION AND ORDER

Plaintiff Catherine Ann Sessor brings this action under 42 U.S.C. §405(g) challenging a final decision of Defendant Commissioner denying her application for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under the Social Security Act. Both parties have filed summary judgment motions. For the reasons set forth below, Plaintiff's Motion for Summary Judgment [Doc. #10] will be GRANTED, and Defendant's Motion for Summary Judgment [Doc. #14] DENIED, with the case being remanded for further administrative proceedings pursuant to Sentence Four of § 405(g).[1]

## PROCEDURAL HISTORY

On November 8, 2007, Plaintiff filed applications for SSI and DIB, alleging

_____

[1]The parties have consented to Magistrate Judge jurisdiction under 28 U.S.C. § 636(c).

disability as of August 30, 2006 (Tr. 93, 101).  After the initial denial of the claims, Plaintiff filed a request for an administrative hearing, held before Administrative Law Judge ("ALJ") Theodore Grippo (Tr. 9).  Plaintiff, represented by counsel, testified (Tr. 12-19), as did Plaintiff's husband (Tr. 19-25), and Vocational Expert ("VE") Ms. Gells (Tr. 25-30).  On February 19, 2010, ALJ Grippo found that Plaintiff was not disabled (Tr. 49-50).  On February 25, 2011, the Appeals Council denied review (Tr. 1-5).  Plaintiff filed for judicial review of the Commissioner's decision on April 15, 2011.

## **BACKGROUND FACTS**

Plaintiff, born October 31, 1966, was 43 when the ALJ issued his decision (Tr. 93). She completed high school and worked previously as a cashier, cook, and press operator (Tr. 165, 171).  Her application for benefits alleges disability as a result of a bipolar disorder and anxiety (Tr. 164).

### A.    **Plaintiff's Testimony**

Plaintiff testified that she currently lives in an apartment in Chesterfield, Michigan (Tr. 12).  She denied military service or formal training beyond high school (Tr. 13).  She stated that she did not know her height, weight, or when she stopped working (Tr. 13).  She reported that her last job involved running machines (Tr. 14).  She stated that she stopped working because she was engaged in self-mutilation consisting of cutting herself with razor blades and burning her left arm with cigarettes (Tr. 14, 17).  She alleged that her mental problems were precipitated by her mother's death (Tr. 14).  She reported that her psychological problems resulted in three hospitalizations over the course of 2005 and 2006,

adding that one of the hospitalizations was precipitated by her threat of suicide (Tr. 15). She reported frequent hallucinations involving her deceased mother (Tr. 15-16). She testified that her husband, a semi truck driver, now took her on trips with him to ensure that she did not harm herself (Tr. 17-18). She stated that she had not left her home by herself in over a year (Tr. 18).

Plaintiff alleged that in addition to the above conditions, she experienced memory problems (Tr. 18). She opined that her suicidal tendencies and fatigue precluded all work (Tr. 18-19).

### B.   Testimony of Plaintiff's Husband,

 Plaintiff's husband ("Sessor"), testified that his wife began cutting herself in the beginning of 2005, three months after the death of her mother (Tr. 19). He stated that at the time of Plaintiff's hospitalizations, his trucking job kept him away from home a significant portion of the time (Tr. 20). He stated that as a result of his fear that his wife would hurt herself,  he had been taking her on his road trips for the past year (Tr. 20). Sessor testified that his wife currently experienced hand tremors (Tr. 20). He reported that she did not hold a current driver's license (Tr. 20). He indicated that he accompanied Plaintiff to her psychiatry appointments but did not regularly sit in on the sessions (Tr. 20). He testified, in effect, that his wife had not cut or burned herself since she began accompanying him on road trips (Tr. 21). He also noted that his wife had recently experienced a panic attack at a grocery store (Tr. 22).

At the close of Sessor's testimony, Plaintiff's counsel stated that treating sources had

stated that believed that the tremors were psychologically based (Tr. 24). The ALJ suggested that Plaintiff should undergo further imaging tests to rule out a neurological cause for the tremors (Tr. 24). Counsel stated that Plaintiff's claustrophobia made MRI testing difficult (Tr. 25).

### C.    Medical Evidence

### 1.  Treating Sources[2]

A December, 2004 MRI of the brain was unremarkable (Tr. 477). In February, 2005, Plaintiff was admitted for six days of psychiatric inpatient treatment after voicing suicidal ideations (Tr. 337, 497-498). During inpatient treatment, Plaintiff denied suicidal thoughts or hallucinations (Tr. 337). She was discharged in stable condition with a GAF of 50[3] (Tr. 338). In April, 2005, Plaintiff reported that she continued to "converse[]" with her deceased mother (Tr. 392). She reported that she had recently quit using marijuana (Tr. 392). In May, 2005, a left knee arthroscopy was performed without complications (Tr. 491, 561). In June, 2006, Plaintiff underwent right carpal tunnel release (Tr. 486-487, 546-547). Treatment notes state that her social and and family history were "unremarkable" and that she exhibited a pleasant affect (Tr. 545). The following week, Plaintiff was admitted for psychiatric

---

[2]Treatment records for conditions unrelated to Plaintiff's claim for DIB have been reviewed in full, but are omitted from discussion.

[3]

A GAF score of 41-50 indicates "[s]erious symptoms ... [or] serious impairment in social, occupational, or school functioning," such as inability to keep a job. American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* at 34 (*DSM-IV-TR* ) (4th ed.2000).

inpatient treatment after expressing suicidal ideation and reporting hallucinations (Tr. 610).

Plaintiff was released the following day after denying either ideations or hallucinations (Tr.

611).  In July, 2006, Plaintiff was admitted for "partial" hospitalization after reporting

depression, irritability, mood swings, agitation, and suicidal thoughts (Tr. 322).  Treating

notes found "[n]o apparent psychosis" (Tr. 363).  Plaintiff reported a suicide gesture the

previous month (Tr. 327).  She was discharged with a GAF of 40[4] (Tr. 323).  The same

month, she reported tremors in all extremities (Tr. 402).

In September, 2006, neurologist Nalini Samuel, M.D. performed a physical

examination of Plaintiff in response to the reports of tremors (Tr. 213-214, 472-473).  Dr.

Samuel speculated that the condition was related to Plaintiff's long-term Lithium use (Tr.

213).  A physical examination was unremarkable (Tr. 214).  Dr. Samuel advised Plaintiff to

undergo imaging tests to rule out a benign tumor (Tr. 214).  A September, 2006 MRI yielded

inconclusive results but a followup study, performed in January, 2007, was normal (Tr. 210).

 An MRI of the cervical spine was also normal (Tr. 209).

January, 2007 therapy notes by Gail Rinehart state that Plaintiff did not engage in self-

mutilation while taking Lithium (Tr. 240).  October and November, 2007 treatment records

by Macomb Family Services state that Plaintiff, traumatized by childhood abuse, was now

experiencing financial problems (Tr. 221).  Plaintiff was encouraged to seek employment (Tr.

---

[4]

GAF score of 31-40 indicates "some impairment in reality testing or communication OR major impairment in several areas such as work, school, family relations, judgment, thinking or mood." *Diagnostic and Statistical Manual of Mental Disorders--Text Revision* at 34 (*DSM-IV-TR*)(4th ed. 2000).

220).  Plaintiff exhibited normal intelligence and cognitive skills with good insight and fair

judgment (Tr. 222).  She reported suicidal thoughts, but was deemed at "minimal" risk for

harming herself at that time (Tr. 223).  Plaintiff also reported being traumatized by her

mother's 2002 death (Tr. 223).  The same month, therapist Rinehart noted that Plaintiff's

mood was "fair" but that she was agitated (Tr. 252).  On November 28, 2007, Plaintiff

reported that she and her husband were facing eviction from their home (Tr. 249).

    In January, 2008, Plaintiff reported that she was sleeping well but avoided going to

movies, eating in restaurants, and playing bingo (Tr. 270).  In February, 2008, Plaintiff

requested a disability opinion from psychiatrist Rose Demczuk, M.D. (Tr. 233).  Dr.

Demczuk opined that Plaintiff's bipolar disorder prevented all work (Tr. 273).  Rinehart's

March, 2008 notes state that Plaintiff admitted that she recently experienced "one really bad

day" in which "she burned herself" (Tr. 261).  Treating notes from the following week state

that Plaintiff's mood was brighter and that she was shopping at a local store (Tr. 260).   In

April, 2008, Dr. Demczuk composed a letter on behalf of Plaintiff's disability claim, stating

that despite the use of psychotropic medication, Plaintiff continued to experience depression

and engage in self-mutilation (Tr. 228, 286).  Dr. Demczuk stated that Plaintiff was "highly

anxious, angry, irritable and depressed" (Tr. 228).   Dr. Demczuk found Plaintiff

"permanently disabled from work" (Tr. 228).  In July, 2008, Plaintiff reported that she was

in a "funk" as a result of her son's incarceration and her daughter's daily requests for money

(Tr. 281).  The following month, Plaintiff reported that she was now traveling with her

husband (Tr. 279).

October, 2008 treating notes indicate that Plaintiff enjoyed accompanying her husband on road trips but did not leave home by herself (Tr. 226). The same month, Rinehart's treating notes state that Plaintiff was upset that her son was facing jail time (Tr. 256). Plaintiff reported that she had driven to several stores in the past two weeks but did not go into the stores (Tr. 256). Rinehart, noting Plaintiff's former abuse of alcohol and marijuana as well as the primary psychological diagnoses, assigned her a GAF of 50 (Tr. 624-625). Rinehart remarked that Plaintiff had not engaged in self-mutilation or abused drugs in the past year (Tr. 627). In November, 2008, Plaintiff denied marijuana use for the past two months (Tr. 622).

In June, 2009, Plaintiff reported that she continued traveling with her husband and that she had been dreaming about her mother (Tr. 634). Rinehart assured Plaintiff that such dreams were normal (Tr. 634). Plaintiff stated that the tremors "come[] and go[]" (Tr. 634). In July, 2009, Plaintiff reported that her tremors were worse (Tr. 640).

### 2. Non-Treating Sources

In December, 2007, L. Banerji, M.D. performed a consultive physical examination of Plaintiff on behalf of the SSA (Tr. 305). He noted a history of treatment for depression and panic attacks as well as a history of substance abuse which was currently in remission (Tr. 307).

In January, 2008, psychologist Shelley Galasso Bonanno performed a consultive psychological examination of Plaintiff on behalf of the SSA (Tr. 313-321). Plaintiff reported a history of a bipolar disorder, depression, and panic attacks (Tr. 313). She denied the

current use of alcohol or illicit drugs (Tr. 314).  Plaintiff reported that she spent most of her time housebound (Tr. 315).  She alleged that her husband had to prompt her to perform self-care tasks (Tr. 318).  Her self esteem was deemed poor with a "slowed but organized" thought process (Tr. 316).  She was oriented to time, place, and person (Tr. 317).  Dr. Bonanno assigned Plaintiff a GAF of 44 (Tr. 318).

The same month, Kathy A. Morrow performed a non-examining Psychiatric Review Technique Assessment of Plaintiff's treating and consultive records, finding the presence of affective, personality, and substance abuse disorders (Tr. 290, 294-295).  Under the "'B' Criteria," Morrow found moderate limitations in activities of daily living, social functioning, and concentration, persistence, or pace (Tr. 297).  Morrow also completed a Mental Residual Functional Capacity Assessment, finding that Plaintiff was moderately limited in the ability to understand, remember, and carry out detailed instructions or concentrate for extended periods (Tr. 301).  Plaintiff was also deemed moderately limited in the ability to get along with coworkers without exhibiting behavior extremes and setting realistic goals (Tr. 302).  Morrow noted that Plaintiff was able to care for her pets, drive, shop, and was not receiving current psychiatric treatment (Tr. 303).  Morrow concluded as follows:

> [Claimant] retains the mental capacity to sustain an independent routine of simple work activity.  She can tolerate low stress social demands and adapt to simple changes in routine.  She may be limited in meeting more complex and detailed work demands (Tr. 303).

### D.  Vocational Expert Testimony

VE Gells classified Plaintiff's former job as a injection mold machine tender as

-8-

unskilled and exertionally light; fast food cook, semi-skilled/medium; and work as a cashier, semi-skilled/light[5] (Tr. 26-27).  The ALJ then posed the following hypothetical question, taking into account Plaintiff's age, work experience, and education:

> [A]ssume that . . . the person's only limitation is that mentally they are limited to simple, routine, repetitive type of work.  Would such a person be able to do any of the past relevant work of the claimant? (Tr. 27).

In response, the VE testified that the individual could perform Plaintiff's past work as an injection mold machine tender (Tr. 27).  However, the VE testified that if the individual were also limited by tremors of the dominant hand precluding fine motor skills, all work would be precluded (Tr. 28).  The ALJ then asked the VE to return to the original hypothetical question (Tr. 27) with the following additional limitations:

> Take the first hypothetical, which was simple on the mental level, but add to that the additional mental limitations.  That, number one, the individual suffers from hallucinations that are auditory, visual, and tactile and has these hallucinations everyday all be it just for a few minutes at a time.  Second, the individual is so afraid of being in public that if she can't see her husband she may burst into tears.  And she is so afraid of strangers that while at home she's constantly checking through the peephole to see that no one else is outside that door, no strangers outside that door. . . . Would an individual with those limitations be able to do either the work that was identified as simple, the injection mold tender, or any other work? (Tr. 29).

---

[5]

20 C.F.R. § 404.1567(a-d) defines *sedentary* work as "lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools;  *light* work as "lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds;" *medium* work as "lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds;" and that exertionally *heavy*  work "involves lifting no more than 100 pounds at a time with frequent lifting or carrying of objects weighing up to 50 pounds.

The VE replied that if the additional psychological limitations were credited, all work would be precluded (Tr. 29). The VE stated that her testimony was consistent with the information found in the *Dictionary of Occupational Titles* ("DOT")(Tr. 30).

### E. The ALJ's Decision

Citing Plaintiff's medical records, ALJ Grippo found that Plaintiff experienced the "severe" impairment of an affective disorder but that the condition did not meet or medically equal an impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (Tr. 38, 40). Citing the non-examining Psychiatric Review Technique, he determined that she experienced moderate deficiencies in social functioning, activities of daily living, and concentration, persistence, or pace (Tr. 40).

The ALJ found that Plaintiff retained the residual functional capacity ("RFC") for "a full range of work at all exertional levels" with the nonexertional limitations of "simple, routine, repetitive work" (Tr. 42). Citing the VE's testimony, he found that she could perform her past relevant work as a injection mold machine tender (Tr. 49).

The ALJ rejected Plaintiff's claims of frequent hallucinations and the inability to leave the house unaccompanied, noting that her allegations of extreme limitation were contradicted by the treating records (Tr. 43-48). He found that Plaintiff's ability to go "on the road" with her husband involving "being away from home for an extended period and encountering new places and people, and eating and sleeping in different locations" stood at odds with her claims of psychological disability (Tr. 44). He also noted that Plaintiff's self described daily activities included household chores, caring for pets, and shopping in stores on a weekly

-10-

basis (Tr. 44).  The ALJ cited Dr. Demczuk's January, 2009 finding that Plaintiff's condition has stabilized and her condition was improving (Tr. 47).

## STANDARD OF REVIEW

The district court reviews the final decision of the Commissioner to determine whether it is supported by substantial evidence.  42 U.S.C. §405(g); *Sherrill v. Secretary of Health and Human Services,* 757 F.2d 803, 804 (6th Cir. 1985).  Substantial evidence is more than a scintilla but less that a preponderance.  It is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971) (*quoting Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 229, S. Ct. 206, 83 L.Ed.126 (1938)). The standard of review is deferential and "presupposes that there is a 'zone of choice' within which decision makers can go either way, without interference from the courts." *Mullen v. Bowen,*  800 F.2d 535, 545 (6th Cir. 1986)(en banc).  In determining whether the evidence is substantial, the court must "take into account whatever in the record fairly detracts from its weight." *Wages v. Secretary of Health & Human Services*, 755 F.2d 495, 497 (6th Cir. 1985). The court must examine the administrative record as a whole, and may look to any evidence in the record, regardless of whether it has been cited by the ALJ.  *Walker v. Secretary of Health and Human Services*, 884 F.2d 241, 245 (6th Cir. 1989).

## FRAMEWORK FOR DISABILITY DETERMINATIONS

Disability is defined in the Social Security Act as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental

impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §423(d)(1)(A). In evaluating whether a claimant is disabled, the Commissioner is to consider, in sequence, whether the claimant: 1) worked during the alleged period of disability; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of an impairment listed in the regulations; 4) can return to past relevant work; and 5) if not, whether he or she can perform other work in the national economy. 20 C.F.R. §416.920(a). The Plaintiff has the burden of proof at steps one through four, but the burden shifts to the Commissioner at step five to demonstrate that, "notwithstanding the claimant's impairment, he retains the residual functional capacity to perform specific jobs existing in the national economy." *Richardson v. Secretary of Health & Human Services,* 735 F.2d 962, 964 (6th Cir.1984).


## ANALYSIS

Plaintiff makes four arguments in favor of remand. First, she argues that the record does not support the finding that she could perform her past relevant work as a machine tender. *Plaintiff's Brief* at 11-13. Next, she contends that the ALJ improperly discounted her allegations of disability. *Id.* at 13-16. Third, she faults the ALJ for rejecting Dr. Demczuk's disability opinions. *Id.* at 16-20. Finally, Plaintiff argues that portions of the VE's testimony, if credited, would direct a finding of disabled. *Id.* at 20-22.

Errors in the ALJ's credibility analysis require a remand. In addition, the ALJ's hypothetical question failed to adequately reflect Plaintiff's limitations in concentration,

-12-

persistence and pace, drawing into question his finding that Plaintiff could perform her past work. Given the clear necessity for a Sentence Four remand based on these errors, it is not necessary to address Plaintiff's other arguments.

## A.  The ALJ's Credibility Determination

Plaintiff disputes the finding that her allegations were not wholly credible, arguing in effect that the ALJ ignored the great weight of evidence supporting her allegations and instead "cherry picked" the transcript for evidence supporting the Step Four finding. Specifically, she argues that her ability to accompany her husband on road trips, cited by the ALJ in support of the credibility determination, does not establish that she is capable of full-time work.  *Plaintiff's Brief* at 14-16.  She also contends that her allegations are supported by the January, 2008 consultive findings of psychologist Bonanno.[6]  *Id.* at 16.

I agree that the ALJ's credibility determination was based on a selective and inconsistent reading of the record. In *Davis v. Apfel,* 133 F. Supp. 2d 542, 547 (E.D. Mich. 2001) the court held that "[t]he reviewing court must affirm the Commissioner's findings if they are supported by substantial evidence and the Commissioner employed the proper legal

---

[6]

Plaintiff does not appear to argue that the ALJ failed to abide by the *procedural* requirements for the credibility determination as set forth in SSR 96-7p and indeed, I find that the ALJ complied with the two-step analysis described in the Regulation.  *See Duncan v. Secretary of Health and Human Services,* 801 F.2d 847, 853 (6th Cir.  1986).  Under SSR 96-7p, the ALJ "must consider whether there is an underlying medically determinable physical or mental impairment. . .that can be shown by medically acceptable clinical and laboratory diagnostic techniques." *Id.*  Second, SSR 96-7p directs that whenever a claimant's allegations regarding "the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence," the ALJ must analyze his testimony "based on a consideration of the entire case record." *Duncan,* at 853.

-13-

standard." *Id.*  The court cautioned, however, that "a substantiality of evidence evaluation does not permit a selective reading of the record.  Substantiality of the evidence must be based upon the record taken as a whole. Substantial evidence is not simply some evidence, or even a great deal of evidence. Rather, the substantiality of evidence must take into account whatever in the record fairly detracts from its weight." *Id.*; *Laskowski v. Apfel,* 100 F. Supp. 2d 474, 482 (E.D. Mich. 2000).  *See also Cotter v. Harris*, 642 F.2d 700, 706 (3rd Cir. 1981) ("'Substantial evidence' can only be considered as supporting evidence in relationship to all the other evidence in the record"); *Kent v. Schweiker*, 710 F.2d 110, 114 (3rd Cir. 1983) ("Nor is evidence substantial if it is overwhelmed by other evidence...").

There are a number of problems with the ALJ's credibility determination. Looking at this record as a whole, it appears that the ALJ selectively took certain factors out of context, giving them undue weight in relation to countervailing evidence that would point toward disability. The ALJ ascribed great significance to the fact that the Plaintiff had taken to accompanying her husband, a truck driver, on his road trips:

> "Recently, on June 16, 2009, Gail Rinehart, the claimant's therapist, wrote that the claimant 'spent most of her time on the road with her husband,' which was confirmed by both the claimant and her husband at the hearing.  The undersigned notes the activities involved with being on the road with her husband, such as being away from home for an extended period of time, encountering new places and people, and eating and sleeping in different locations, is inconsistent with the severe and debilitating symptoms and limitations described by the claimant at the hearing.  The undersigned also notes that the claimant put her mental health treatment on hold to go on the road with her husband, which suggests that the alleged symptoms and limitations may not be as severe as the claimant suggests in this case." (Tr. 44).

Discounting the Plaintiff's claims of fear and anxiety about being home alone, the

-14-

ALJ again referenced her travel with her husband:

> "Although the claimant reported paranoia, fear and anxiety with being home alone, the claimant reported to Ms. Rinehart that she was spending most of her time away from home on the road with her husband. This is generally inconsistent with the debilitating symptoms and limitations testified to by the claimant and her husband at the hearing." (Tr. 47).

In relying on Plaintiff's traveling with her husband as "activities of daily living" that would weigh against her credibility or a finding of disability, the ALJ failed to consider the strong inference that it was only the presence of a supportive spouse that allowed her to undertake the "activities involved with being on the road," and that taking these trips does not show that she had "improved" to the extent that she could function outside the supportive presence of her husband. As the ALJ acknowledged (Tr. 47), this was a woman who was prescribed Lithium, Thorazine and Wellbutrin, potent psychotropic and mood stabilizing medications, and whose therapists diagnosed bipolar disorder, with "intermittent, sporadic notes of agitation, mood instability, depression, difficulty in social situations, and difficulty with being left alone" (Tr. 46). "[T]he proper test for receipt of...disability benefits requires the ability to do eight hours a day of physical or mental activity for pay for five days a week on a continuous basis." SSR 96-8p. Accompanying her husband on some of his road trips falls short of demonstrating that Plaintiff has that ability.

In discounting the Plaintiff's credibility, the ALJ also relied on her "relatively high GAF score" of 60 on November 18, 2008 (Tr. 47). Yet he gave little or no weight to previous GAF scores of 25 and 44, the latter being assigned by an SSA examiner (Tr. 45, 48). It is true, of course, that while GAF scores may be evidence of serious symptoms, "[t]hey are

subjective opinions, representing a snapshot of a person's level of functioning at a given moment in time, not a rating of their ability to work." *Jordan v. Commissioner of Social Sec.*, 2011 WL 891198, *5 (E.D.Mich. 2011). However, stressing a "high" score while discounting a "low" score again amounts to a selective reading of the record. More to the point, the ALJ failed to consider that the fluctuating scores, viewed in the context of the entire record, may be more reflective of the Plaintiff's labile mental condition than an indication that the condition has "improved" to the extent that she can sustain employment.[7]

The ALJ further discounted Plaintiff's credibility based on her alleged non-compliance with medication. Noting that Plaintiff was prescribed Lithium, Thorazine and Wellbutrin, all psychotropic/mood stabilizing drugs, the ALJ stated, "However, the record indicates a certain amount of non-compliance with taking medication as prescribed. In one instance, the claimant's primary care physician, Dr. Aaron Ellis, noted that the claimant simply chose not to fill a prescription he wrote for a hypertension medication." (Tr. 44; *see also* Tr. 47). What does blood pressure medication have to do with Plaintiff's psychological impairments? In fact, at Step Two, the ALJ found that hypertension was *not* a severe impairment (Tr. 39-40). On the other hand, there is no evidence that Plaintiff is non-compliant with her psychotropic medication.

---

[7] At the hearing, the ALJ questioned counsel about the Macomb County Health records showing an improved GAF. Counsel stated, "I think from my interaction with the two of them [Plaintiff and her husband] I think the improvement that she has, has been the result of her husband taking her on the road. She does function when she's with him at a higher level." (Tr. 23).

The ALJ assessed little weight to Plaintiff's testimony regarding her history of self-mutilation, i.e. cutting and burning herself, stating, "However, while the undersigned recognizes the above behavior as detrimental to the claimant, the undersigned notes that the exact nature and frequency of this behavior have not been established in the record." (Tr. 46). While the Plaintiff's own testimony about this was somewhat imprecise (Tr. 17), the ALJ did not address Plaintiff's husband's testimony that the cutting and burning started in 2005, after her mother died, and that Plaintiff began accompanying him on his road trips in June of 2008, because "she couldn't be home alone, she would hurt herself." (Tr. 9-10). Therapist Rinehart's records also showed that Plaintiff "hurt herself" in 2007 and 2008. In diminishing the significance of Rinehart's records, the ALJ stated that he "also finds it persuasive that information regarding the claimant hurting herself appears in the records of Ms. Rinehart but not in the records of the claimant's psychiatrist, Dr. Demczuk" (Tr. 46). Yet earlier in the opinion, the ALJ observed that Dr. Demczuk's "primary role was medication maintenance." *Id*. It should not be surprising, then, that Rinehart, not Demczuk, would have the more detailed notes. This inconsistency in the administrative opinion is another example of the failure to assess the record in context, as an integrated whole.

**B.    Step Four Determination / Hypothetical Question**

Plaintiff also challenges the ALJ's Step Four determination that she could perform her past work as an injection mold machine tender. Apart from the flawed credibility determination, the Step Four decision is questionable, given the ALJ's finding that Plaintiff suffered moderate restrictions in concentration, persistence or pace ("CPP") (Tr. 41).

-17-

Moreover, the ALJ's hypothetical question to the VE failed to account for his finding of moderate deficiencies in CPP:[8]

> "[A]ssume that . . . the person's only limitation is that mentally they are limited to simple, routine, repetitive type of work.  Would such a person be able to do any of the past relevant work of the claimant?" (Tr. 27).

Moderate deficiencies in CPP suggest substantial limitations which must be acknowledged in the hypothetical question.  *Edwards v. Barnhart,* 383 F.Supp.2d 920, 931 (E.D.Mich.2005) (Friedman, J.).   The failure to account for moderate deficiencies in concentration, persistence and pace in the hypothetical question constitutes reversible error. *Ealy v. Commissioner of Social Sec.,* 594 F.3d 504, 516 -517 (6th Cir. 2010)("simple repetitive tasks" limitation, by itself, insufficient to account for the claimant's moderate deficiencies in CPP).[9]  While the ALJ need not use talismatic language or include the phrase

---

[8] I recognize that an ALJ is not required to use a VE at Step Four. *See Studaway v. Secretary of Health and Human Services,* 815 F.2d 1074, 1076 (6th Cir.1987); *See also Mays v. Barnhart,* 78 Fed. Appx. 808, 813–814 (3rd Cir.2003)("At step four of the sequential evaluation process, the decision to use a vocational expert is at the discretion of the ALJ"). However, to the extent that he exercised his discretion and relied on the VE's testimony, he ought to have posed a valid hypothetical question that accurately framed Plaintiff's vocational limitations. In addition, but for the flawed credibility analysis, the ALJ may well have proceeded to Step Five, and may well do so on remand.

[9] While Plaintiff did not raise a discrete argument challenging the hypothetical question, this issue is fairly subsumed under her argument that the ALJ erred in finding that she could perform her past relevant work. In addition, in *Wright v. Comm. of Soc. Sec.*, 2010 WL 5420990 (E.D. Mich. 2010), Judge Friedman  held that a court may find reversible error and remand for benefits even where the Social Security plaintiff does not even file a motion for summary judgment:

> "[T]his Court holds that a complaint filed pursuant to 42 U.S.C. § 405(g) appealing the Secretary's final decision denying Social Security disability

-18-

"moderate deficiencies in concentration, persistence, and pace" in the hypothetical to avoid remand, *see Smith v. Halter,* 307 F.3d 377, 379 (6th Cir.2001), "unskilled work," or "simple work" are generally insufficient to account for moderate concentrational impairments. *Bankston v. Commissioner,* 127 F.Supp.2d 820, 826 (E.D.Mich.2000)(Zatkoff, J.); *Benton v. Commissioner of Social Sec.* 511 F.Supp.2d 842, 849 (E.D.Mich.,2007)(Roberts, J.); *Edwards v. Barnhart,* 383 F.Supp.2d 920, 931 (E.D.Mich.2005) (Friedman, J.); *Newton v. Chater,* 92 F.3d 688, 695 (8th Cir.1996); *McGuire v. Apfel,* 1999 WL 426035, *15 (D.Or.1999); *Roe v. Chater,* 92 F.3d 672, 676–77 (8th Cir.1996).

While the VE classified the injection mold machine tender position as "unskilled," the ALJ's hypothetical question failed to account for the persistence and pacing requirements of the job. Under the above-cited cases, this was reversible error.

Based on the erroneous credibility determination and the flawed hypothetical question (which led to a flawed Step Four determination), this case will be remanded. The remaining question is whether this Court should reverse for an award of benefits or for further administrative proceedings. *Faucher v. Secretary of Health and Human Services,* 17 F.3d 171, 176 (6th Cir. 1994), and *Newkirk v. Shalala,* 25 F.3d 316, 318 (6th Cir. 1994), hold that it is appropriate to remand for an award of benefits when "all essential factual issues have been

---

benefits, may not be dismissed for failure of the plaintiff to prosecute when the plaintiff fails to file a summary judgment motion as requested by the Magistrate....Stated another way, once the plaintiff has filed a complaint stating his grounds for appeal from the Secretary's decision, he has done all that is required of him by § 405(g)." *Id*. at *3. (Citing *Kenney v. Heckler*, 577 F.Supp. 214 (N.D. Ohio 1983)).

resolved and the record adequately establishes a plaintiff's entitlement to benefits." *Id.* This entitlement is established if "the decision is clearly erroneous, proof of disability is overwhelming, or proof of disability is strong and evidence to the contrary is lacking. *Faucher,* 17 F.3d at 176 (citing *Mowery v. Heckler*, 771 F.2d 966, 973 (6th Cir. 1985)).

I cannot say on this record that the Plaintiff has an unimpeachably clear case for benefits, or that proof of her disability is overwhelming. Instead, the case will be remanded for further proceedings consistent with this Opinion, including a re-assessment of Plaintiff's credibility and a properly crafted hypothetical question that accounts for her deficiencies in CPP.

## **CONCLUSION**

For these reasons,

IT IS ORDERED that Defendant's Motion for Summary Judgment [Doc. #14] is DENIED.

IT IS FURTHER ORDERED that Plaintiff's Motion for Summary Judgment [Doc. #10] is GRANTED.

IT IS FURTHER ORDERED that the Commissioner's denial of benefits is REVERSED.

IT IS FURTHER ORDERED that this matter is REMANDED to the Commissioner pursuant to Sentence Four of 42 U.S.C. § 405(g), for proceedings consistent with this Opinion and Order.

A judgment consistent with this Order shall issue.


s/ R. Steven Whalen
R. STEVEN WHALEN
UNITED STATES MAGISTRATE JUDGE

Date:  September 25, 2012

CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served upon counsel of record via the Court's ECF System to their respective email addresses or First Class U.S. mail disclosed on the Notice of Electronic Filing on September 25, 2012.


s/Johnetta M. Curry-Williams
Case Manager